UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DONTIE S. MITCHELL,

                     Plaintiff,

                                     9:19-CV-0718
v.                                    (MAD/ML)

ANTHONY J. ANNUCCI, Acting Commissioner, in his
individual capacity; JEFF McKOY, Deputy Commissioner,
in his individual capacity; CHRISTOPHER MILLER,
Superintendent, in his individual capacity; and DAVID
BARRINGER, Deputy Superintendent, in his individual
capacity,

                     Defendants.
_____

APPEARANCES:                          OF COUNSEL:

DONTIE S. MITCHELL
  *Pro Se* Plaintiff
12 Tyler Street, 1st Floor
Troy, New York 12180

LETITIA A. JAMES                    HELENA O. PEDERSON, ESQ.
Attorney General for the State of New York     Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, New York 12224


MIROSLAV LOVRIC, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION</u>

     Currently before the Court, in this civil rights action filed by Dontie S. Mitchell

("Plaintiff") against Anthony J. Annucci, Jeff McKoy, Christopher Miller, and David Barringer

("Defendants"), are (1) Defendants' motion for summary judgement pursuant to Fed. R. Civ. P.

56, and (2) Plaintiff's cross-motion for summary judgment pursuant to Fed. R. Civ. P 56.  (Dkt.

Nos. 162, 165.)  For the reasons set forth below, I recommend that Plaintiff's Complaint be

dismissed, Defendants' motion for summary judgement be granted in part, and Plaintiff's cross-

motion for summary judgment be denied.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

Generally, liberally construed, Plaintiff's Amended Complaint asserts that—pursuant to

the First Amendment and 42 U.S.C. § 1983—Defendants violated his right to freedom of

association while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow").

(*See generally* Dkt. Nos. 1, 12, 51, 52.)  The Court's Decisions and Orders dated July 19, 2019,

and December 5, 2019, thoroughly outline Plaintiff's allegations and claim.  (Dkt. No. 12 at 5-8;

Dkt. No. 51 at 3-4.)

### B.    Procedural History

On June 18, 2019, Plaintiff commenced this civil rights action by the filing of a

Complaint dated June 17, 2020.  (Dkt. No. 1.)  On July 19, 2019, United States District Judge

Mae A. D'Agostino issued an order that granted Plaintiff's IFP application, and—after reviewing

the Complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A—permitted the action to go

forward with respect to Plaintiff's claim that Defendants violated his right to freedom of

association.[1]  (Dkt. No. 12.)  In addition, Judge D'Agostino denied Plaintiff's motions for a

preliminary injunction and appointment of counsel.  (*Id*.)

---

[1]    Judge D'Agostino's order also dismissed for failure to state a claim upon which relief
may be granted the following four claims: (1) First Amendment Free Exercise and RLUIPA
claims related to Plaintiff's religious freedom, (2) First Amendment claims related to the right to
petition, (3) claims related to Plaintiff's religious freedom, and (4) claims related to the
"unwritten" social media ban.  (Dkt. No. 12.)

On October 21, 2019, Plaintiff filed a motion to amend the complaint. (Dkt. No. 37.) On December 5, 2019, Judge D'Agostino accepted Plaintiff's Amended Complaint for filing and deemed it to be the operative pleading. (Dtk. No. 51.) In addition, Judge D'Agostino ordered that, after reviewing the Complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A, Plaintiff's claim that Defendants violated his right to freedom of association survived *sua sponte* review, but all of Plaintiff's other claims were dismissed. (Dkt. No. 51.)

On June 16, 2020—after several warnings by the Court about his unwarranted litigiousness—Judge D'Agostino barred Plaintiff "from filing any further motions in this matter without first obtaining leave of the Court." (Dkt. No. 118.)

On April 6, 2021, Defendants filed the pending motion for summary judgment. (Dkt. No. 162.) On April 9, 2021, without seeking prior permission from the Court, Plaintiff filed the pending cross-motion for summary judgment. (Dkt. No. 165.)

### C.    Defendants' Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Statement of Material Facts and not denied by Plaintiff in his response. (*Compare* Dkt. No. 162, Attach. 3 [Defs.' Statement of Material Facts], *with* Dkt. No. 167 [Pl.'s Resp.].)

1.    Plaintiff, Dontie S. Mitchell (DIN 98-A-0071), was an incarcerated individual held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

2.    At the time of the events relevant to this matter, Plaintiff was incarcerated at Great Meadow.[2]

---

[2]    Although Plaintiff denies this fact, his denial does not relate to the fact asserted and thus will be deemed admitted by the Court. *See Yetman v. Capital Dist. Transp. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point

<u>Ujamaa Fraternal Dynasty</u>

3.      Plaintiff describes the Ujamaa Fraternal Dynasty ("UFD") as a "mutual self-improvement fraternity of like minds, both men and women, joined together in brotherhood and sisterhood to achieve mutual success and prosperity," which he founded on July 29, 2008. Plaintiff further describes the UFD as "devoted to Black socio-economic empowerment, organizing Black people for wealth and power."  He states that "[p]art of UFD's social platform is to prevent youth violence, crime, and drug use.  UFD does so by establishing fraternal bonds between and among its members.  From this fraternal relationship, UFD is able to implement its practice of mutual self-improvement where its members push and challenge each other to do better, be better, and know better."

4.      Plaintiff proposed that the Great Meadow chapter of the UFD, if approved, would have "two central goals": (1) to establish the UFD as a national organization for reforming and rehabilitating offenders; and (2) "to serve as a positive alternative to gangs," particularly for young offenders.

5.      The UFD is not a political or religious organization.

---

of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

<u>Requests to form Inmate Organizations under DOCCS Dir. 4760</u>

6.      "An Inmate Organization is a collective inmate group that has been approved to function by the Deputy Commissioner for Program Services through a formal application and review process."

7.      DOCCS has well-established rules and procedures in place for the review and approval of incarcerated individuals' requests to form an Inmate Organization at DOCCS facilities, which are set forth in DOCCS Directive No. 4760 ("Dir. 4760").[3]

8.      Defendant McKoy, as DOCCS' Deputy Commissioner for Program Services, is the approving authority for Dir. 4760.

9.      Pursuant to Dir. 4760, an incarcerated individual may request approval for an Inmate Organization by completing Form #3087, "Request for Approval to Form an Inmate Organization."

10.      All requests to form Inmate Organizations must be specific to the facility where the incarcerated individual is housed at the time the request is made.  An incarcerated individual cannot use such requests to establish DOCCS-wide Inmate Organizations.[4]

---

[3]      Plaintiff admits this fact "to the extent [that] these rules and regulations exist, but otherwise den[ies] their constitutionality as applied to UFD." (Dkt. No. 167 at 22-23 ¶ 7.)  The Court deems this fact admitted because a response to a statement of material fact may not include argument.  *See Maioriello v. New York State Office for People With Developmental Disabilities*, 272 F. Supp. 3d 307, 311 (N.D.N.Y. 2017) (Suddaby, C.J.) ("[T]hroughout Plaintiff's Rule 7.1 Response, she 'admits' many of the facts asserted by Defendants in their Rule 7.1 Statement but then includes additional facts and/or legal *argument* in those responses. . . . Where this occurs, the Court will deem those facts admitted and disregard the additional factual assertions and/or *argument* that Plaintiff provides in her responses.") (emphasis added); *Emanuel v. Griffin*, 13-CV-1806, 2015 WL 1379007, at *1 (S.D.N.Y. Mar. 25, 2015) ("Plaintiff's Rue 56.1 statement routinely recites facts that are irrelevant to the paragraph of Defendants' statement to which they ostensibly correspond and, just as often, engages in inappropriate legal argument.").

[4]      *See*, *supra*, note 3.

11.    An incarcerated individual also cannot use such requests to form violent, radical, or extremist groups at his or her facility.  Finally, an incarcerated individual cannot use such requests to duplicate an Inmate Organization that is already established at his or her facility.[5]

12.    The reasons for these rules include, but are not limited to: preventing the operation of a business by an incarcerated individual; preventing the formation of gangs or other groups that would engage in illegal activity under the guise of an approved Inmate Organization; correlating the size of a proposed Inmate Organization to the size of the incarcerated individual's correctional facility in order to allocate appropriate resources; ensuring that there is actual interest in the proposed Inmate Organization at the incarcerated individual's correctional facility, in order to foster the long-term success of the proposed organization at such facility; and preventing the misuse of facility resources (i.e., if the proposed Inmate Organization duplicates an already established organization, such duplication would put a strain on available resources—

---

[5]    Plaintiff denies this fact by arguing that it is "unconstitutionally applied to UFD."  The Court deems this fact admitted for the reasons stated in note 3.  In addition, the Court notes that Plaintiff failed to provide any citation to the record for his denial.  *See N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's S.D.N.Y. Local Rule 56.1 statement but declined to provide record citations in support); *Meaney v. CHS Acquisition Corp.*, 103 F. Supp. 2d 104, 109 (N.D.N.Y. 2000) (Kahn, J.) ("[T]he Court . . . deem[ed] admitted as uncontroverted all the facts properly set forth in" the movant's statement of material facts, where nonmovant "failed to comply with the requirements of L.R. 7.1(a)3.").

including funding, staff, space, and materials—at the incarcerated individual's correctional facility).[6]

13.     Preventing the operation of a business by an incarcerated individual helps to ensure that incarcerated individuals do not have access to or influence over sources of funds outside of accounts set up under DOCCS' control.  The purposes of such policy include: (a) preventing incarcerated individuals from shielding money from mandatory legal obligations; (b) deterring escape by restricting incarcerated individuals' access to available outside funds; (c) preventing incarcerated individuals from being able to extort money from others; (d) preventing incarcerated individuals from committing fraud upon members of the public; (e) preventing the use of funds for any illegal purpose; and (f) reducing record-keeping burdens on facility staff.[7]

14.     Historically, unauthorized Inmate Organizations have played a significant role in prison disturbances.[8]

15.     A completed Form #3087 is reviewed by a (a) facility's (i) Inmate Organization Coordinator, (ii) Deputy Superintendent for Programs, and (iii) Superintendent, and (b) DOCCS' (i) Director of Education, and (ii) Deputy Commissioner for Program Services.

---

[6]     The Court deems this fact admitted because Plaintiff's initial response is "[a]dmit" and he appears to attempt to place this admission in context, which is inappropriate in a statement of material facts.  *See*, *supra*, note 2.

[7]     *See*, *supra*, note 6.

[8]     Plaintiff denies this fact "to the extent that the Defendants never claim UFD has a history of disruption within New York State correctional facility."  However, as set forth in note 2, the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts.

16.    The Deputy Commissioner for Program Services is responsible for determining whether a request to form an Inmate Organization is approved, disapproved, or must be returned due to incomplete or incorrect information.[9]

17.    All other reviewers provide only recommendations for approval (or disapproval) of the request.[10]

18.    On or around February 16, 2018, Plaintiff submitted a Request for Approval to Form an Inmate Organization seeking to form a Great Meadow Chapter of the UFD.

19.    Great Meadow's Inmate Organization Coordinator and Deputy Superintendent for Programs recommended disapproval on February 20, 2018, and March 1, 2018, respectively, for the following reasons: (1) the UFD would be duplicative of the African Cultural Organization ("ACO"), an Inmate Organization that had already been vetted and approved at Great Meadow; (2) the UFD encouraged rebellious behavior by its members; and (3) an internet search of the UFD showed that it condoned extremism and the use of violence to achieve its goals.

20.    Defendant Miller (as Superintendent of Great Meadow) recommended disapproval of Plaintiff's request on March 1, 2018, for the following reasons: (1) the request

---

[9]    Plaintiff denies this fact and claims that "the Commissioner of the [NYS DOCCS] is its 'Chief Executive Officer' and could overrule a decision by the Deputy Commissioner for Program Services." (Dkt. No. 167 at 23, ¶ 16.)  The Court rejects this denial for two reasons. First, the assertion by Plaintiff does not directly contradict the fact as asserted.  *See*, *supra*, note 2.  Second, the portion of the record that Plaintiff cites to in support of this contention does not support the contention that the Commissioner of DOCCS has the authority to overrule a decision by the Deputy Commissioner for Program Services.  (*See* Dkt. No. 162, Attach. 11 at ¶¶ 4-5.)

[10]    Plaintiff denies this fact and alleges that the Deputy Commissioner for Program Services "is just a rubber stamp." (Dkt. No. 167 at 23 ¶ 17 [citing Dkt. No. 162, Attach. 12 at ¶ 15].)  The Court rejects this denial for two reasons.  First, the assertion by Plaintiff does not directly contradict the fact as asserted.  *See*, *supra*, note 2.  Second, the portion of the record that Plaintiff cites to in support of this contention does not support the conclusion that the Deputy Commissioner for Program Services is merely a rubber stamp.  (*See* Dkt. No. 162, Attach. 12 at ¶ 15.)

was incomplete and lacked sufficient detail about the UFD's proposed activities and goals; (2) the target membership listed in the request (125 members) was not obtainable; (3) a staff advisor was not identified; and (4) Great Meadow already offered a wide variety of Inmate Organizations that would provide similar opportunities for membership.

21.     The Director of Education recommended disapproval of Plaintiff's request on April 16, 2018.

22.     Defendant McKoy (as Deputy Commissioner for Program Services) disapproved Plaintiff's request on April 24, 2018, and denied the application on April 26, 2018.

23.     Neither Defendant Annucci nor Defendant Barringer had any role in the review or disapproval of Plaintiff's request.

24.     Plaintiff submitted a revised request to form a chapter of the UFD at Great Meadow on or around May 31, 2018.

25.     Plaintiff's revised request was not accepted for review.

26.     Plaintiff wrote to Defendant McKoy via letter dated May 28, 2018, and to Governor Cuomo and Defendant Annucci via letter dated May 29, 2018, seeking reconsideration of the April 26, 2018, denial of his request to form a Great Meadow chapter of the UFD.

27.     In response, Defendant McKoy's office advised Plaintiff—via letter dated July 5, 2018—that Plaintiff's request had been denied, the reasons stated in the decision had been confirmed, there was "no valid reason to review the Central Office determination," and such decision was "final."

28.     According to its Constitution and By-Laws, "[t]he basic aims of the African Cultural Organization at Great Meadow Correctional Facility are to study and understand the social, political and economical [sic] experience of Blacks in American society."

29.    "The objectives of the African Cultural Organization are to establish meaningful and positive educational programs as a means of promoting cultural pride, awareness, growth and development and self-esteem, as well as preparing inmates to be productive and responsible individuals upon their return to society."

30.    The ACO does not encourage rebellious behavior or espouse extremist views.

31.    The ACO was an approved Inmate Organization at the time of Plaintiff's initial request to form a Great Meadow chapter of the UFD.  However, it was inactive at Great Meadow at that time.[11]

32.    The ACO at Great Meadow was later suspended in May 2018 due to lack of membership/nonpayment of dues.[12]

33.    As of July 2018, the DOCCS staff member overseeing the ACO was in the process of recruiting interested incarcerated individuals to continue the organization.[13]

34.    Accordingly, Plaintiff was encouraged to participate in the ACO, even after it was suspended.[14]

---

[11]    Plaintiff denies this fact and cites to his declaration.  (Dkt. No. 167 at 24 ¶ 31.)  The Court rejects this denial because Plaintiff's declaration supports the assertion that ACO was inactive at the time of his application.  (Dkt. No. 167 at 10 ¶ 25 ["[T]he ACO was not just 'inactive' but it was defunct, dead, done, finished, and over."].)

[12]    The parties dispute whether ACO was permanently disbanded and could be restarted. (Dkt. No. 167 at 24 ¶ 32; Dkt. No. 167 at 10 ¶¶ 25-29.)  *See*, *supra*, note 11.

[13]    Plaintiff denies this fact and cites to his affidavit.  (Dkt. No. 167 at 24 ¶ 33.)  However, Plaintiff's affidavit states merely that efforts were made to recruit interested individuals to join ACO in "reaction to [Plaintiff's] persistent push to get a prison chapter of UFD approved there" and that the effort to recruit was unsuccessful.  (Dkt. No. 167 at 10 ¶ 29.)  This does not contradict Defendants' assertion.  As a result, the Court deems this fact admitted.

[14]    Plaintiff attempts to deny this fact by placing in context the reason that he opted not to join ACO, which is not a contradiction of the fact asserted.

35.     Plaintiff was also encouraged to participate in other approved Inmate Organizations at Great Meadow.  He was reminded that "an inmate may be removed from membership status or elected office based on violations of Departmental directives, facility policy and procedures, the approved Inmate Organization's Constitution and By-Laws, or conviction of a Tier II or Tier III charge."[15]

36.     Within the past several years of Plaintiff's incarceration, he has been disciplined for several serious infractions including Tier II and Tier III charges, such as: refusing to obey direct orders; violent conduct; creating disturbances; fighting; smuggling; weapons possession; and drug possession.[16]

37.     After his request to form a UFD chapter at Great Meadow was denied, Plaintiff continued his attempts to promote the UFD at Great Meadow, which was in violation of DOCCS rules.

**D.     Plaintiff's Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Plaintiff in his Statement of Material Facts and not denied by Defendants in their response.  (*Compare* Dkt. No. 165, Attach. 2 [Pl.'s Statement of Material Facts], *with* Dkt. No. 168, Attach. 2 [Defs.' Resp. Statement Pursuant to Rule 56.1].)

1.     Plaintiff is the leader, founder, and creator of UFD.

2.     Since 2008, Plaintiff has led unauthorized prison chapters of UFD within DOCCS' correctional facilities.

---

[15]     *See*, *supra*, note 14.

[16]     Plaintiff's response to Defendants' Statement of Material Facts does not include a response to Defendants' assertion at paragraph 36.  (*See generally* Dkt. No. 167 at 22-25.)  As a result, the Court deems this fact admitted.

3.      Defendants identify and monitor prison groups operating within their correctional facilities that are disruptive and represent a threat to prison safety and security.

4.      Body 2 Soul, which is UFD literature, does not "promote radicalization, rebellion, violence, or obstruction against others."

5.      In prison, Plaintiff used UFD to positively organize, motivate, inspire, educate, and mentor young prisoners, and to steer young prisoners away from gangs, drugs, and violence.[17]

6.      Through UFD, Plaintiff has been successful at encouraging young prisoners to change and better themselves.[18]

7.      UFD is an exclusive mutual self-improvement fraternity.

8.      UFD has a membership that is fraternal and family oriented.[19]

9.      UFD is devoted to the socio-economic empowerment of Black and disadvantaged people regardless of race, color, and creed.

---

[17]      Defendants assert that there is "no admissible evidence regarding Plaintiff's purported use of the UFD" in the record.  (Dkt. No. 168, Attach. 2 at ¶ 8.)  However, Plaintiff's affidavit—sworn to under penalty of perjury pursuant to 28 U.S.C. § 1746—explicitly sets forth his use of UFD.  (Dkt. No. 165 at 4 ¶ 19 [stating that "[i]n prison, I use UFD to positively organize, motivate, inspire, educate, and mentor young prisoners and to steer them away from gangs, drugs, and violence."].)

[18]      See, supra, note 17; see also Dkt. No. 165 at 4-5 ¶ 21 [stating that "[t]hrough UFD, I have been successful at encouraging young prisoners to change and better themselves."].)

[19]      Defendants deny Plaintiff's asserted fact and cite to Plaintiff's request for approval to form an inmate organization.  (Dkt. No. 168, Attach. 2 at ¶ 11 [citing Dkt. No. 162, Attach. 5 at 2, 9].)  It is unclear to the Court what the basis is for Defendants' denial.  It appears as though Defendants dispute Plaintiff's use of the adjective "small" when referring to UFD's membership size, which included approximately 125 members.  (Dkt. No. 162, Attach. 5 at 2, 9.)  As a result, the Court removed that word from the asserted fact.

10.    In 2018, Plaintiff sought permission to form a prison chapter of UFD at Great Meadow.

11.    According to Plaintiff, Defendants denied Plaintiff's request because they determined "that UFD would be (i) duplicative of an approved inmate organization; (ii) noncompliant with DOCCS Directive No. 4760; and (iii) potentially dangerous, given information demonstrating that UFD is part of a larger organization that condones the use of violence to accomplish its goals."

12.    When Plaintiff was transferred to Washington Correctional Facility, he sought approval to form a prison chapter of UFD there and his request was denied without explanation.

13.    UFD is considered an "unauthorized organization" because Defendants have not recognized or approved it pursuant to Dir. 4760.

14.    Because UFD is an "unauthorized organization," Prison Rule 105.14 prohibits prisoners from possessing or distributing UFD literature and organizational materials, and from holding UFD meetings and study groups to discuss UFD beliefs, customs, and norms.

15.    On February 20, 2020, Plaintiff was placed in solitary confinement for sixty-one days at Great Meadow, for possessing UFD literature and organizational materials.

16.    On November 3, 2020, Plaintiff was placed in solitary confinement for ninety-eight days at Marcy Correctional Facility for possessing UFD literature and organizational materials.

17.    Sometime after Plaintiff initiated this action, Defendants or other DOCCS employees have been monitoring UFD and intercepting and withholding UFD's mail and e-mails to and from outside supporters and members of UFD.

E.    **Parties' Briefing on Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment**

1.    **Defendants' Memorandum of Law-in-Chief**

Generally, in support of their motion for summary judgment, Defendants asserts the following four arguments: (1) Plaintiff's requests for declaratory and injunctive relief are moot because of his transfer out of Great Meadow; (2) Defendants Annucci and Barringer were not personally involved in the decision to disapprove Plaintiff's request to form a Great Meadow chapter of UFD and thus, were not personally involved in any alleged constitutional violation derived therefrom; (3) Plaintiff failed to establish a First Amendment freedom of association claim; and (4) Defendants are entitled to qualified immunity.  (Dkt. No. 162, Attach. 1 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff's transfer out of Great Meadow moots his request for declaratory and injunctive relief related to his incarceration at Great Meadow.  (*Id*. at 11-12.) Defendants argue that Plaintiff is no longer housed at Great Meadow, where Defendant Miller— as Great Meadow Superintendent—made the recommendations at issue.  (*Id*.)  In addition, Defendant Barringer has retired and no longer serves as the Deputy Superintendent of Programs at Great Meadow.  (*Id*.)  As a result, Defendants argue that Plaintiff's First Amendment claim seeking declaratory and injunctive relief must be dismissed against Defendants Miller and Barringer.  (*Id*.)

Second, Defendants argue that the record lacks evidence sufficient to establish the personal involvement of Defendants Annucci or Barringer.  (*Id*. at 12-14.)  More specifically, Defendants argue that, to the extent that Plaintiff seeks damages, his claim fails against Defendants Annucci and Barringer for lack of personal involvement because Defendant Annucci had no involvement in the review of requests to form inmate organizations and Defendant

Barringer did not start working at Great Meadow until after Plaintiff's request was denied by

Defendant McKoy.  (*Id.*)  In addition, Defendants argue that, to the extent that Plaintiff seeks

declaratory and injunctive relief only, his claim still fails against Defendants Annucci and

Barringer because there is no evidence that they had "some connection with the enforcement" of

Directive 4760 as it relates to Plaintiff's claim.  (*Id.*)

Third, Defendants argue that the undisputed facts show that the challenged action in this

case—the disapproval of Plaintiff's request to form a Great Meadow chapter of the UFD—is

reasonably related to the legitimate penological interests set forth by the Supreme Court in

*Turner v. Safley*, 482 U.S. 78, 89-91 (1987).  (*Id.* at 15-19.)  More specifically, Defendants argue

that the record evidence shows that Plaintiff's request to form a Great Meadow chapter of the

UFD was disapproved by Defendant McKoy based on the recommendations by Defendant Miller

and other reviewers including that (1) UFD would be duplicative of the ACO, which had already

been vetted and approved at Great Meadow, (2) UFD encouraged rebellious behavior by its

members, (3) an internet search of UFD showed that it condoned extremism and the use of

violence to achieve its goals, (4) the request was incomplete and lacked sufficient detail about

the UFD's proposed activities and goals, (5) the target membership was unobtainable, (6) a staff

advisor was not identified, and (7) Great Meadow already offered a wide variety of inmate

organizations that would provide similar opportunities for membership.  (*Id.*)  In addition,

Defendants argue that prison officials have broad discretion to determine the types of inmate

organizations that serve the goals set forth in Directive 4760 and the Court should defer to the

prison administrators making those decisions.  (*Id.*)

Fourth, Defendants argue that they are entitled to qualified immunity because an

incarcerated individual cannot maintain a First Amendment freedom of association claim where

the challenged action is reasonably related to legitimate penological interests. (*Id*. at 19-21.) In addition, Defendants argue that it was objectively reasonable to believe that they were acting in accordance with established law and not violating Plaintiff's rights when Plaintiff's request to form a Great Meadow chapter of the UFD was disapproved based on his failure to comply with DOCCS rules regarding such requests and the rules are reasonably related to legitimate penological interests. (*Id*.)

### 2.    Plaintiff's Memorandum of Law-in-Chief

Generally, in support of his cross-motion for summary judgment, Plaintiff asserts the following two arguments: (1) Defendants' decision not to recognize or approve prison chapters of UFD was not reasonably related to legitimate penological interests; and (2) summary judgment in favor of Defendants based on their professional judgment is prohibited without granting Plaintiff relief pursuant to Fed. R. Civ. P. 56(d). (Dkt. No. 165, Attach. 1 [Pl.'s Mem. of Law].)

First, Plaintiff argues that UFD has operated within DOCCS for years without being disruptive and Defendants cannot produce evidence that UFD promotes radicalization, rebellion, violence, or obstruction. (*Id*. at 3-7.) Plaintiff argues that UFD and its members are family and the purpose of UFD is to "positively organize, motivate, inspire, educate, and mentor young prisoners and to steer them away from gangs, drugs, and violence." (*Id*.) Plaintiff argues that Defendants' judgment that UFD is potentially dangerous is based on a deliberate misrepresentation of facts. (*Id*.)

Second, Plaintiff argues that an expert opinion would confirm that prison chapters of UFD would have a positive impact in a correctional setting. (*Id*. at 7-9.) Plaintiff argues that without being able to present an expert opinion and depose prison officials and members of UFD

who are—or were—incarcerated, he cannot rebut any "professional judgment" by Defendants

that UFD would be unsuitable within a correctional setting.  (*Id*.)  Plaintiff argues that

Defendants' assertion that UFD is potentially dangerous is rebutted by UFD's literature and

organizational materials and the fact that there is no documented history of disruptive activities

by UFD.  (*Id*.)  Plaintiff argues that he should be appointed counsel for the purpose of

conducting "the necessary depositions and for finding a suitable expert."  (*Id*.)

### 3.  Plaintiff's Opposition

Generally, in opposition to Defendants' motion for summary judgment, Plaintiff asserts

the following five arguments: (1) his requests for declaratory and injunctive relief are not moot;

(2) disapproving prison chapters of UFD is unconstitutional because (a) there is no valid, rational

connection to a legitimate government interest, (b) no alternative means existed for Plaintiff to

exercise his associational rights, (c) accommodating prison chapters of UFD would not have a

significant ripple effect, and (d) there are ready alternatives that would fully accommodate

Plaintiff's rights with a *de minimis* cost to penological interest; (3) Defendant Annucci is an

appropriate party; (4) Plaintiff is entitled to summary judgment; and (5) Defendants' claim that

UFD is potentially dangerous is based on inadmissible hearsay.  (Dkt. No. 167 at 29-52 [Pl.'s

Opp'n Mem. of Law].)

First, Plaintiff argues that although he is no longer housed at Great Meadow, the problem

sought to be remedied still exists because he seeks recognition of UFD as an authorized inmate

organization in all DOCCS facilities—not just Great Meadow—and the ability to communicate

with UFD members while on parole.  (*Id*. at 34-36.)  Plaintiff argues that because UFD is an

unauthorized inmate organization, the possession of UFD literature is prohibited and Plaintiff has

been placed in solitary confinement for possessing UFD literature and materials on two

occasions in the last year.  (*Id.*)  As a result, Plaintiff argues that his requests for declaratory and injunctive relief are not moot.  (*Id.*)

Second, Plaintiff sets forth several reasons that disapproving prison chapters of UFD is unconstitutional.  (*Id.* at 36-46.)  Plaintiff argues that the seven reasons proffered by Defendants for disapproving Plaintiff's request to form an authorized chapter of UFD at Great Meadow were invalid, inaccurate, untrue, exaggerated, and based on hearsay.  (*Id.* at 39-42.)  In response to those seven reasons, Plaintiff argues that (1) ACO has no members, meetings or programs and UFD has a gang, drug, and violence intervention component that ACO lacked, (2) Defendants' conclusion that UFD encourages rebellious behavior and condones extremism appears to be based on an internet search conducted by Phil Melecio and there is no sworn testimony before the Court from Mr. Melecio explaining why he came to that conclusion, (3) he submitted a revised proposal with additional details regarding the UFD chapter and Defendants refused to consider it, which contradicts Defendants' argument that his application was "incomplete" or "lack sufficient detail," (4) UFD already had sixteen active members at the time of his application and would only need to maintain twenty-five due-paying members, (5) it was the responsibility of the Superintendent—not his—to appoint a staff advisor, and (6) there were no active inmate organizations at the time of his application.  (*Id.*)  Plaintiff argues that because the membership in UFD is "fraternal, sacred, perpetual, and almost religious," it is entitled to the most protection afforded by the Constitution and telling him to participate in another inmate organization is analogous to telling a deeply religious person that they must select another religion to practice in prison.  (*Id.* at 42-43.)  Plaintiff argues that if prison chapters of UFD were approved, they would decrease violence and compliment the educational and therapeutic programs that DOCCS offers.  (*Id.* at 43-44.)  Plaintiff argues that Defendants can fully

accommodate his associational rights at a *de minimis* cost to the penological interests that they cite by treating UFD the same as they treat NOGE and using technology to monitor communication among UFD members. (*Id*. at 44-46.)

Third, Plaintiff argues that Defendant Annucci is an appropriate party to his claim because Defendant Annucci is the chief executive officer of DOCCS which grants him "jurisdiction over the approval and disapproval of inmate organizations." (Dkt. No. 167 at 46-47.)

Fourth, Plaintiff argues that he is entitled to summary judgment. (Dkt. No. 167 at 47-51.) More specifically, Plaintiff argues that correction officers at Marcy Correctional Facility ("Marcy") lost many of his legal papers including discovery materials and declarations related to this case. (*Id*.) Plaintiff argues that the documents that were lost would prove: (1) the ACO was defunct at the time Plaintiff made his request for approval to form a Great Meadow chapter of UFD, (2) the UFD materials that he was sentenced to solitary confinement for possessing, were returned to him, which suggests that those materials did not encourage, condone, promote, or advocate extremism, radicalization, rebellion, violence, or obstruction, (3) Defendants cannot produce any evidence that UFD has been disruptive or classified as a security threat group. (*Id*.) Plaintiff argues that financial constraints have inhibited his ability to depose prison officials. (*Id*.) Plaintiff argues that he should be permitted to obtain testimony from prison officials and an expert about the decision to deny his application to form a Great Meadow chapter of UFD. (*Id*.)

Fifth, Plaintiff argues that Defendants' assertion that UFD is potentially dangerous is based on inadmissible hearsay. (Dkt. No. 167 at 51.) Plaintiff argues that the basis for Defendants' assertion appears to be an internet search conducted by Phil Melecio but that

Defendants failed to submit an affidavit or declaration from Mr. Melecio explaining the basis for his conclusion.  (*Id.*)

    **4.**    **Defendants' Memorandum of Law in Further Support of Their Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment**

Generally in further support of their motion for summary judgment and in opposition to Plaintiff's cross-motion for summary judgment, Defendants assert the following six arguments: (1) Plaintiff has failed to comply with the local rules; (2) Defendants have introduced admissible evidence in support of their motion; (3) Plaintiff has not introduced admissible evidence to support his claims; (4) Plaintiff fails to establish the personal involvement of Defendant Annucci in any constitutional violation; (5) Defendants are entitled to summary judgment; and (6) Plaintiff is not entitled to relief under Fed. R. Civ. P. 56(d).  (*See generally* Dkt. No. 168 [Defs.' Mem. of Law].)

First, Defendants argue that, in violation of N.D.N.Y. L.R. 56.2, Plaintiff failed to respond to their statement of material fact paragraph number 36, and to the extent that he denied other paragraphs, he did not provide support for such denials with citations to record evidence. (*Id.* at 3-4.)  Defendants also argue that Plaintiff improperly filed two memoranda of law, which, when combined, exceed the maximum 25-page limit set forth in N.D.N.Y. L.R. 7.1(c).[20]  (*Id.*)

---

[20]    The Court notes that a letter addressed to the Clerk of the Court included with Plaintiff's opposition memorandum of law stated that "Defendants filed their motion for summary judgment electronically on April 6, 2021, the same day I placed in the mail my own motion for summary judgment. . . . So, I did not receive the Defendants' motion until <u>April 13, 2021</u>."  (Dkt. No. 167 at 1 [emphasis in original].)  As a result, Plaintiff could not comply with N.D.N.Y. L.R. 7.1(c), which states that "[i]f a party makes a cross motion, it must join its cross-motion brief with its opposition brief, and this combined brief may not exceed twenty-five (25) pages in length."

Second, Defendants argue that they have submitted certified business records that constitute an exception to the hearsay rule under Fed. R. Evid. 803(6).  (*Id*. at 4-5.)  In addition, Defendants argue that the recommendations to deny Plaintiff's application to form a Great Meadow chapter of UFD were not hearsay because they were not submitted for the truth of the matters asserted, but rather, to demonstrate the bases on which the recommendations were made at the time.  (*Id*.)

Third, Defendants argue that Plaintiff has failed to submit admissible evidence that demonstrates Defendants violated his First Amendment freedom of association rights.  (*Id*. at 5-7.)  Defendants argue that Plaintiff fails to lay a proper foundation, which would qualify him to evaluate the programs offered by DOCCS or to express an opinion on the reasons that programs are approved or disapproved by DOCCS' administration.  (*Id*.)  In addition, Defendants argue that the declaration of Brian Moran that Plaintiff submitted is irrelevant because he was incarcerated at Great Meadow from December 2018, to January 2020, which was after Plaintiff's request to form a Great Meadow chapter of UFD was denied.  (*Id*.)

Fourth, Defendants argue that Plaintiff concedes—by failing to respond—to Defendants' argument that Defendant Barringer was not personally involved in any constitutional violations. (*Id.* at 7-8.)  Further, Defendants argue that Plaintiff fails to establish the personal involvement of Defendant Annucci in any constitutional violation.  (*Id*.)  Defendants argue that Plaintiff's assertions that Defendant Annucci may override Defendant McKoy and approve prison chapters of UFD, are without any factual support and are directly controverted by the declarations of Defendants Annucci and McKoy.  (*Id*.)

Fifth, Defendants argue that they are entitled to summary judgment.  (*Id*. at 8-9.) Defendants argue that they are not required to prove that a banned organization caused problems

in the past or that it is likely to cause problems in the future. (*Id*.) Further, Defendants argue that because other alleged "extremist" groups have been approved at other DOCCS facilities, does not require the approval of UFD at Great Meadow. (*Id*.) Defendants argue that Plaintiff bears the burden of establishing that the denial of his request was not reasonably related to a legitimate penological interest and he has failed to meet that burden. (*Id*.)

Sixth, Defendants argue that Plaintiff is not entitled to relief pursuant to Fed. R. Civ. P. 56(d) because his declarations fail to explain how the facts that he seeks to obtain are reasonably expected to raise a genuine issue of material fact. (*Id*. at 10-11.)

### 5. Plaintiff's Letter Response in Further Support of His Cross-Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment[21]

Generally, in further support of his cross-motion for summary judgment and in opposition to Defendants' motion for summary judgment, Plaintiff asserts the following. (*See generally* Dkt. No. 174 [Pl.'s Letter Reply].)

First, Plaintiff argues that Defendants admit that the hearsay evidence—that UFD encourages and condones rebellious behavior, extremism, and violence—is not submitted for the truth. (Dkt. No. 174 at 1.) Thus, Plaintiff argues that Defendants are essentially arguing that the Court should "rubber-stamp their infringement of [his] First Amendment associational rights just because their stated reasons for doing so sound good." (Dkt. No. 174 at 1.) Plaintiff argues that Defendants must set forth evidence showing how disapproving UFD is rationally connected to their stated penological interests. (*Id*.)

---

[21] Plaintiff is cautioned that his submissions must comply with this Court's Local Rules, including the requirements that (1) "all motions and opposition motions [include] a memorandum of law," (N.D.N.Y. L.R. 7.1[b]), (2) a memorandum of law must contain a table of contents (N.D.N.Y. L.R. 7.1[b][1]), and (3) the text in the body of a filed document must be double-spaced (N.D.N.Y. L.R. 10.1[a][3]).

Second, Plaintiff argues that an expert opinion and depositions are necessary to establish his case and he has been unable to afford an expert or obtain legal representation. (*Id.* at 2.) Plaintiff argues that his declaration sets forth that an expert and depositions will elicit facts that will answer whether (1) Defendants' disapproval of UFD was an exaggerated response to prison concerns, (2) recognizing and approving prison chapters of UFD will have a significant ripple effect on fellow inmates or prison staff, and (3) alternatives would fully accommodate Plaintiff's associational rights at a *de minimis* cost to valid penological interests. (*Id.*) Plaintiff argues that Defendants unreasonably disapproved UFD and UFD "is actually a benefit to the reform and rehabilitation of young prisoners." (*Id.* at 2-3.)

### 6. Defendants' Surreply in Further Support of Their Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment

Generally, in further support of their motion for summary judgment and in opposition to Plaintiff's cross-motion for summary judgment, Defendants argue that Plaintiff's requests for declaratory and injunctive relief are moot. (*See generally* Dkt. No. 182 [Defs.' Mem. of Law].) Defendants argue that in light of a recent material change to Plaintiff's circumstances—namely, Plaintiff's release from the custody of DOCCS on September 9, 2021—Plaintiff's claims for injunctive and declaratory relief against all Defendants are moot. (*Id.*) Defendants argue that, to the extent that Plaintiff's claims against Defendants Annucci and McKoy remained after his transfer out of Great Meadow to another facility (and to the extent that Plaintiff's claims sought general approval of the UFD in all DOCCS facilities), those claims are also now moot because Plaintiff is no longer incarcerated. (*Id.*) Defendants argue "because [Plaintiff] is no longer incarcerated, [he] will not be in a position to submit requests to form chapters of the UFD at DOCCS facilities and, as such, will not be subject to any actions (i.e., denials) that could be taken on such requests." (*Id.* at 5.)

7.    **Plaintiff's Surreply Letter in Further Support of His Cross-Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment[22]**

Generally, in further support of his cross-motion for summary judgment and in opposition to Defendants' motion for summary judgment, Plaintiff argues that his claim involves the denial of his request for approval to form a Great Meadow chapter of UFD *and* his abilities to (1) form prison chapters of UFD in any DOCCS facility, and (2) distribute literature and organizational materials to incarcerated members and prospects of UFD. (Dkt. No. 184 [Pl.'s Surreply Letter Brief].) As a result, Plaintiff argues that his claim is not moot because Defendants' disapproval of UFD continues to have a direct impact on his ability to "propagate UFD's purpose, aims, beliefs, and principles to those still incarcerated and with whom [he has] a First Amendment right to intimate association." (*Id.*)

## II.    LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[23] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

---

[22]    *See*, *supra*, note 21.

[23]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[24] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[25] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[26]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

---

[24]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[25]    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[26]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[27]–even when the non-movant was proceeding *pro se*.[28]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[29] Stated another way, when a non-movant fails to oppose a legal argument

---

[27]    Among other things, Local Rule 56.1 (previously Local Rule 7.1[a][3]) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

[28]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[29]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

asserted by a movant, the movant may succeed on the argument by showing that the argument

possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See*

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested therein

. . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30,

2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at

\*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

### A.    Whether Plaintiff's Requests for Declaratory and Injunctive Relief are Moot

After carefully considering the matter, I recommend that the Court answer this question

in the affirmative for the reasons set forth in Defendants' memoranda of law.  (Dkt. No. 162,

Attach. 1; Dkt. No. 168; Dkt. No. 182.)

On September 9, 2021, Plaintiff was released from incarceration.  (Dkt. No. 176.)  As a

result, Plaintiff is no longer in a position to submit a request to form a Great Meadow chapter of

UFD (or at any other DOCCS facility) and thus, will not be subject to any action (i.e.,

disapprovals) that could be taken in response to such a request.[30]  *See Polimeda v. Breslin*, 95-

CV-5364, 95-CV-5365, 1999 WL 167683, at \*1 (E.D.N.Y. Jan. 12, 1999) (quoting *Preiser v.

Newkirk*, 422 U.S. 395, 401 (1975)) (dismissing as moot the plaintiffs' claim that their

constitutional rights were violated by the defendants' denial of "their application to form a

---

[30]    Plaintiff argues in his surreply that, even though he is no longer incarcerated, he is unable to "distribute UFD literature and organizational materials to incarcerated members and prospects of UFD" because UFD materials are in violation of Prison Rule 105.14.  (Dkt. No. 184.)  The Court notes that Plaintiff has already unsuccessfully litigated the issue of whether Prison Rule 105.14, as applied to him, is unconstitutional.  *Mitchell v. New York State Dep't of Corr. Servs.*, 06-CV-6278, 2012 WL 6204205, at \*9-10 (W.D.N.Y. Dec. 12, 2012).

European American inmate organization" because the "[p]laintiffs have since been released from prison.  For an Article III court to have jurisdiction over a case, there must be an actual case or controversy, which not only exists at the time the complaint is filed, but is 'extant at all stages of review.'")

### B. Whether Plaintiff's Request for Monetary Damages Must be Dismissed

After carefully considering the matter, I recommend that the Court answer this question in affirmative for the reasons set forth below.

### 1. Personal Involvement of Defendants Annucci and Barringer

I recommend that Plaintiff's claim against Defendants Annucci and Barringer seeking monetary damages be dismissed because the record lacks evidence establishing the personal involvement of Defendants Annucci and Barringer, as set forth in Defendants' memoranda of law.  (Dkt. No. 162, Attach. 1; Dkt. No. 168; Dkt. No. 182.)  The following is intended to supplement, but not supplant, those reasons.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen*., 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

Defendant Annucci's declaration, which was sworn to under penalty of perjury, states that "[a]s Acting Commissioner, I am not responsible for reviewing requests to form Inmate Organizations at DOCCS facilities. I have no personal knowledge of Plaintiff's applications to form prison chapters of the UFD at Great Meadow or at any other facility, as I was not involved in the review of such applications and had no role in the denial at issue in this action." (Dkt. No. 162, Attach. 11 at ¶ 16.) Plaintiff's conclusory assertion that Defendant Annucci—as chief executive officer of DOCCS—"has jurisdiction over the approval and disapproval of inmate organizations," without any evidentiary support, is insufficient to withstand Defendants' motion for summary judgment.

Moreover, Defendant Barringer's declaration, which is sworn to under penalty of perjury, states that Plaintiff's application to form a Great Meadow chapter of UFD was submitted and decided before Defendant Barringer became Deputy Superintendent of Programs at Great Meadow in May 2018, "[a]ccordingly, [he] was not involved, and had no role, in the review and subsequent denial of the request at issue in this action." (Dkt. No 162, Attach. 14 at ¶¶ 12-14.) As Defendants set forth in their reply (Dkt. No. 168 at 7-8), Plaintiff's failure to respond to Defendants' arguments regarding Defendant Barringer, is to be treated as a concession by Plaintiff that Defendant Barringer was not personally involved in Plaintiff's claims and should be dismissed.

As a result, I recommend that, to the extent that Plaintiff sought monetary damages against Defendants Annucci and Barringer, those claims be dismissed because there is no dispute of material fact that they were not personally involved in the alleged constitutional violation.

**2.    Genuine Issues of Material Fact Exist with Respect to Plaintiff's Freedom of Association Claim**

I recommend that the Court reject Defendants' argument that they are entitled to summary judgment on Plaintiff's First Amendment freedom of association claim.

In reviewing a First Amendment claim, the Court must draw all reasonable inferences in favor of Plaintiff for purposes of summary judgment. *Giano v. Senkowski*, 54 F.3d 1050, 1054 (2d Cir. 1995). However, Plaintiff still carries the burden of proving that a challenged prison regulation is unreasonable if his action is to survive dismissal. *Giano*, 54 F.3d at 1054.

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls." *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125-26 (1977) (holding that the inmate's status as a prisoner and the operational realities of a prison dictate restrictions on the associational rights among inmates). While "there is no generalized constitutional right of social association, [t]he freedom of 'expressive association,' [. . .], 'protects the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, exercise of religion, or petitioning for the redress of grievances. These are the so-called 'political' associational rights.'" *Jackson v. Goord*, 06-CV-6172, 2011 WL 4829850, at *10 (W.D.N.Y. Oct. 12, 2011) (citing, *inter alia, Dickman v. Mangiaracina*, 199 F.3d 1321, 1999 WL 980966 at *2 (2d Cir. 1999)) (unpublished).

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S.

78, 89 (1987). "The prisoner-plaintiff bears the burden of proving that [a] disputed regulation is

unreasonable." *Giano,* 54 F.3d at 1054.

"Recognizing that federal courts are ill-equipped to deal with the complexities of prison

administration, the Supreme Court has accorded great deference to the determinations of prison

officials and fashioned "a lesser standard of scrutiny . . . in determining the constitutionality of

the prison rules." *Turner v. Safley,* 482 U.S. 78, 81 (1987). The Supreme Court has enumerated

several factors for courts to consider when ruling upon the reasonableness of a prison policy

which allegedly impedes or interferes with a prisoner's constitutional rights:

> [1] there must be a 'valid, rational connection' between the prison regulation and
> the legitimate governmental interest put forward to justify it [citation omitted] [;] .
> . . [2] whether there are alternative means of exercising the right that remain open
> to prison inmates[;] . . . [3] the impact accommodation of the asserted
> constitutional right will have on guards and other inmates, and on the allocation of
> prison resources generally [; and] . . . [4] the absence of ready alternatives is
> evidence of the reasonableness of a prison regulation.

*Turner v. Safley,* 482 U.S. at 89-91.

Although I find persuasive Defendants' arguments with respect to the first factor—that

there is a valid, rational connection between the denial of Plaintiff's application to form a Great

Meadow chapter of the UFD and the legitimate penological interests of DOCCS[31]—issues of fact

remain with respect to the other factors.

---

[31]    Defendant McKoy denied Plaintiff's application based on the recommendations of
Defendant Miller and others. (Dkt. No. 162, Attach. 5 at 10-11.) Defendant Miller's
recommendation noted that Plaintiff's "[p]roposal is incomplete and lacks detail for the specific
group activity + goals. Target group for membership is not obtainable. Staff advisor is not
identified. Facility currently offers a wide variety of inmate organization opportunities." (*Id.* at
10.) Another review noted that "[t]here is already an inmate organization serving this purpose
(ACO). Also purports the use of rebellious behavior." (*Id.*) Mr. Melecio noted that—after an
internet search of UFD—based on documents found, "a fundamental way to gain power is to
build a Sovereign New African Nation, members will give their lives if necessary. Such
statements contain a notion of the use of violence." (*Id.* at 11.) I find that these reasons for
denial are reasonably related to the penological interests underlying the review and approval

With respect to the second factor, the parties dispute whether ACO was duplicative of UFD's purpose. (*Compare* Dkt. No. 162, Attach. 5 at 10 [stating that "[t]here is already an inmate organization serving this purpose (ACO)"], *with* Dkt. No. 165 at 7 ¶ 37-39 [stating that "UFD is uniquely different from the ACO"].) In addition, ACO status as an inmate organization at the time of Plaintiff's application is unclear in the record.[32]

The parties did not thoroughly address the third and fourth factors (although, there appears to be significant overlap between the factors).

Because there is a genuine dispute of material fact regarding whether ACO was duplicative of UFD's purpose and whether ACO was an inmate organization that was available to Plaintiff at the time of his request to form a Great Meadow chapter of UFD, I recommend that the Court deny Defendants' motion on this basis.

### 3. Qualified Immunity

However, I recommend that the Court grant Defendants' motion for summary judgment based on the doctrine of qualified immunity for the reasons set forth in their memorandum of law-in-chief. (Dkt. No. 162, Attach. 1.)

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords

---

process for Inmate Organizations. (Dkt. No. 162, Attach. 12 at ¶ 10; Dkt. No. 162, Attach. 13 at ¶ 11.)

[32]    Defendants acknowledge that ACO was an inactive inmate organization but assert that it could have been restarted at any time. (Dkt. No. 162, Attach. 3 at ¶¶ 31-32.) Plaintiff asserts that at the time of his application, "ACO was not just 'inactive' but it was defunct, dead, done, finished, and over. It had been so for over a year." (Dkt. No. 167 at 10 ¶ 25.)

government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotations and citations omitted). The Court has discretion to determine the order in which it will address the inquiries required when assessing the applicability of qualified immunity. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Pearson* 555 U.S. at 236).

A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft, 563 U.S. at 741.*

In addition, qualified immunity protects state actors when it was objectively reasonable for the state actor to believe that his conduct did not violate a clearly established right. *Manganiello v. City of N. Y.,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017). Therefore, the district court may first

ask whether it was objectively reasonable for any of the defendants to believe their conduct was not unlawful at the time. *Simpson v. City of N. Y.*, 793 F.3d 259, 268 (2d Cir. 2015). Qualified immunity does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

I find that Defendants are entitled to qualified immunity. "Without Second Circuit or Supreme Court authority defining with reasonable specificity [the plaintiff]'s right to form an inmate . . . organization, [the defendants] are entitled to qualified immunity" for monetary damages. *Nicholas v. Miller*, 189 F.3d 191, 195 (2d Cir. 1999). Thus, given "the backdrop of the law at the time of the conduct," it was objectively reasonable for Defendants to believe that their conduct was not unlawful. *Kisela*, 138 S. Ct. at 1152; *see Herring v. NYS Dep't of Corr. Servs.*, 05-CV-4504, 2007 WL 2589496, at *1 (S.D.N.Y. Sept. 6, 2007) (finding that the Plaintiff failed to allege that his right of association pursuant to the First Amendment was violated where he alleged that he requested to form an inmate organization, which was denied); *see also Bacon v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020) (Because no Second Circuit or Supreme Court precedent had put defendant prison officials on notice that inmate could not be punished for statements in an inmate's "letter to a third party expressing his desire for a woman later identified as a female correctional officer," defendants were entitled to qualified immunity).

As a result, I recommend that Plaintiff's Complaint be dismissed based on the doctrine of qualified immunity.

### C.    Plaintiff's Motion for Summary Judgment

For the reasons set forth above in Parts III.A. and III.B. of this report and recommendation, I recommend that the Court deny Plaintiff's motion for summary judgment.

In addition, I recommend that the Court deny Plaintiff's request for relief pursuant to Fed. R. Civ. P. 56(d), for the reasons stated in Defendants' opposition memorandum of law.  (Dkt. No. 168 at 10-11.)

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendants' motion for summary judgement (Dkt. No. 162) be **<u>GRANTED</u>** in so far as it seeks dismissal of Plaintiff's Complaint (Dkt. No. 1) requesting: (1) declaratory and injunctive relief because such claims are moot, and (2) monetary damages against (a) Defendants Annucci and Barringer because they were not personally involved, and (b) Defendants based on the doctrine of qualified immunity; and it is further respectfully

**RECOMMENDED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 165) be **<u>DENIED</u>**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **<u>DISMISSED WITH PREJUDICE</u>**; and it is further respectfully

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[33]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

---

[33]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984

F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir.

1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: January 20, 2022
       Binghamton, New York


                          Miroslav Lovric
                          U.S. Magistrate Judge